ATCHISON, T. & S. F. RY. CO. et al. v.
ABRAHAM. (No. 925.)

(Court of Civil Appeals of Texas. El Paso.
Feb. 13, 1919. Rehearing Denied
March 6, 1919.)

1. ADVERSE POSSESSION ⬦57 — CONTINUITY
OF POSSESSION—EVIDENCE.

Evidence *held* to show continuity of posses-
sion for the necessary 10 years.

2. ADVERSE POSSESSION ⬦85(3) — HOSTILE
POSSESSION—EVIDENCE.

Evidence *held* to support finding that pos-
session was hostile to claim of all others.

3. ADVERSE POSSESSION ⬦60(1) — HOSTILE
POSSESSION.

As regards hostility of possession, it is
enough that those in possession by themselves
or tenants are claiming for themselves in hos-
tility to all others.

Appeal from District Court, El Paso Coun-
ty; P. R. Price, Judge.

Action by Nicholas Abraham against the
Atchison, Topeka & Santa Fé Railway Com-
pany. Judgment for A. S. Thurmond and
another, who intervened, having purchased
from plaintiff after suit was begun, and de-
fendant appeals. Affirmed.

Turney, Culwell, Holliday & Pollard, of El
Paso, for appellant.
Seymour Thurmond and Winter, McBroom
& Scott, all of El Paso, for appellees.

HIGGINS, J. Abraham brought this suit
in trespass to try title against appellant to
recover a parcel of land in block 72 in the
city of El Paso. The tract is 25.7x70x26x70
feet. Upon trial before the court judgment
was rendered in favor of A. S. Thurmond
and Mrs. Annie E. Mitchell, who intervened
as parties plaintiff, having purchased from
Abraham subsequent to the institution of
the suit. The record title was vested in ap-
pellant. Appellees claimed title under the
10-years statute of limitation. By deed
dated May 11, 1887, filed for record May
25, 1887, John Watts conveyed to Thomas
Gugerty a portion of block 72, described as
follows:

"In Block 72, Campbell's addition to El
Paso: Beginning at S. W. corner thereof, thence
running eastward along S. line of said block 70
ft., thence at right angles northward to reserva-
tion of the Rio Grande & El Paso Railway
Company, thence along line of said reservation
in a general S. W. direction to beginning."

The record discloses that the property was
held in trust by Gugerty for E. V. Berrien
and wife. Prior to May 13, 1901, Gugerty
died, and by his will all of his property
passed to his wife, Elizabeth Gugerty. By
deed filed for record May 13, 1901, Elizabeth

Gugerty conveyed the above-described prem-
ises to Mrs. Berrien. By warranty deed
dated July 25, 1906, filed August 1, 1906, Mr.
and Mrs. Berrien conveyed to Abraham the
following:

"In block 72, Campbell's addition to said city:
Beginning in S. line of said block 25.7 ft. more
or less E. of S. W. corner of said block, thence
running eastward along S. line of said block
44.3 ft. more or less, thence at right angles
northward to reservation of Rio Grande & El
Paso R. R. Co., thence along line of said res-
ervation in a general S. W. direction to place
of beginning."

By quitclaim deed dated August 28, 1906,
filed August 31, 1906, the Berriens conveyed
to Abraham:

"In block 72, Campbell's addition to the city
of El Paso, Texas: Beginning at the S. W.
corner thereof, thence running easterly along
the said S. line of said block 25.7 feet to a
point on the S. line of said block, said point
being the S. W. corner of a tract of land con-
veyed by Eliza B. Berrien and E. V. Berrien
to Nicholas Abraham by warranty deed dated
July 25, 1906, recorded in Bk. 84, p. 439, deed
records of El Paso county, Texas, thence north-
easterly along the westerly line of said tract
70 ft. more or less to S. line of the right of
way aforesaid 26 ft. to the westerly line of said
block, thence at right angles southwesterly a
distance of 80 ft. more or less to the place of
beginning."

Abraham was dispossessed by appellant in
1910, and this suit was filed by him on
April 12, 1911.

Mr. Berrien testified:

"I made no examination of the property just
prior to buying it, but did right after, because
the point came up, as I said, it was going to
be a magnificent piece of warehouse property,
and when I had it surveyed, which I did at
once, because I wanted to see just how much
it was, I found that the Atchison-Topeka had
moved their line down south. That is what I
was told at the time, that they had moved their
line south of the line as shown in the Hart's
map and on the Campbell addition old map.
I found that instead of being a very magnificent
piece of property I had bought at a very cheap
price, I did not have very much. But in ex-
amining the thing in going down there I found
there was already a tenant on the property.
I immediately staked the thing out and gave
it to Jesus Gonzales, and told him to see if
he could get some more tenants at a dollar per
month for ground rent. There were several
adobes built on it. Perhaps it was a month or
two months, maybe three months, after I bought
the property until I got tenants in posses-
sion of it, because there were different tenants
there. There was one, to the best of my recol-
lection, there was a little house that was par-
tially on the property then. I rented to another
party, and another party on the front, and then
another one back here (witness referring to a
sketch or plat of the ground then being shown
him).

"Then when those different tenants move off

I did not know, but the property was staked out to show me where I got—Jesus there showed these stakes to me.

"It was run out according to the field notes in the description given in the deed from Watts to Gugerty and was surveyed by a city surveyor. I then placed Jesus Gonzales in charge of it according to the survey as made of the property described in my deed. That was shortly after the execution of the deed from Watts to Gugerty.

"I continued in possession of the property and to occupy it by tenants until I turned the property and tenants over to Mr. Abraham. It was in my possession continuously from year to year until I turned it over to Mr. Abraham. I collected rent every month, except such months as they did not pay me, and they got new tenants. * * *

"I saw the property from time to time, prior to my selling to Abraham. I was down there and saw the property. I had to go down once in a while. When I was there, there were houses on the property. During the time I had those tenants there I was claiming the property. I rendered it for taxation and paid the taxes up to the time Mr. Nicholas Abraham got it from me. * * *

"I think the property was pointed out to Mr. Abraham at the time I sold to him, just pointed out this way (referring to map ° on the ground). There were people living on it then; they and different ones had been living on it since 1887 as tenants of mine. * * *

"I did acquire from John Watts, in the name of my father-in-law, the triangular piece of land adjoining the Santa Fé reservation; that is, the piece I put the houses on. The triangular piece described in the deed from Watts to my father-in-law is all the property I claimed down there; it was not worth fussing about, you see. My impression was, of course, the Santa Fé had gone down too far, down that way (referring to map); but it was not for me to bring a $1,000 or $1,500 suit to prove that.

"I think it was a triangular piece I deeded to Abraham in 1906. I don't remember making a quitclaim deed to the property involved in this suit.

"I don't know anything about whether or not there was no house on this piece 25 by —. I do know there was a house on my triangular piece; that is as far as I go. I don't remember anything about others.

"When I bought the property and had the deed put in my father-in-law's name it was not my purpose or intention to try to get any Santa Fé property.

"It never was my intention to get the Santa Fé—private individuals are not like corporations in that way. I don't know whether there was a house, or any house, a fence, or other improvements on the property described in this quitclaim deed when I sold it to Abraham. I don't want to be misunderstood by saying that there was not any there. I don't remember of there being any there.

"Whether I conveyed to Abraham by quitclaim deed or warranty, I remember that tenants were paying me rent and living on the property that I conveyed to Abraham.

"The only agent I ever had was old Jesus Gonzales. * * * After I bought the property I discovered that the Santa Fé had pushed the line further south than the Hart survey.

"When I found this out I abandoned the idea of building a warehouse on the property, for the reason that it decreased the size of the property. A warehouse has got to have a certain size. This was to be a warehouse with a ground basis, to the best of my recollection, of about twelve thousand square feet. It would not measure up to that with the Santa Fé encroaching on it down there the way it did.

"It was then my intention to lease to tenants through Jesus Gonzales, to hold possession of it, and get money to pay taxes until I could sell it.

"The perfection of my title had something to do with it. I intended to claim it as mine. I did not know but what the Santa Fé would take another move. * * *

"I claimed no more than what Watts sold me. If you put it that way, that is, that I did not want any of the Santa Fé property, that all I wanted to do was to keep them from encroaching on me, as I said before, I did not want to spend any thousand or fifteen hundred dollars in a lawsuit in order to prove that was not the Santa Fé's; because I imagine that the thing involved a great deal of surveying around the town, beginning at this point (referring to map), and going down there, and by the time I got through the property would cost me a great deal of money, even if I got the original warehouse piece of property. I contemplated, though, I felt, that the piece of property probably was mine, but I was not strong enough financially to throw away fifteen hundred dollars to find out. * * *

"My reason for putting tenants on the property was that I felt it was mine. * * *

"I cannot tell you anything about this triangular piece from this map. The property I had abuts on Santa Fé street. There was a dispute sprung up after I had this property a number of years about the right of way. All that time I held possession of that property for a certain period of time—that is, the triangular piece of property described in Watts' deed—but the Santa Fé came forward afterwards, and tried to push the line down. If the triangle shown me on this plat correctly describes the land I acquired from Mr. Watts, that is all the property I was claiming, and that is the property I put in charge of Gonzales. It was never my intention to claim any property except what I got in that deed. * * * I was claiming the property that those houses were on in this depression, and that was the property that myself and Mrs. Berrien sold to Abraham. * * * It was not at any time my intention to quitclaim any property belonging to the railroad company. * * * I did not and could not acknowledge the railroad company's right to property I sold to Abraham."

Mr. Abraham testified:

"I know the property involved in this suit and claim the property as my land. I had possession; tenants of mine renting from me at $20 per month for ground rent. I rented the land to Jose Laguna, he had a good many people on it. I bought the property from E. V. Berrien and wife. There were people living on it when I bought it; there were Mexican shacks on the ground. I had known the property for about two or three years before I

bought it. There were people living on it then; there were some Mexican shacks there on the ground. In 1910 there was some sickness among the people living on the ground, and the city authorities ordered the houses torn down. I was claiming the property then. After the shacks were torn down I put a fence on the line where the shacks were. A day or two after I put the fence up employés of the Santa Fé Railroad Company tore it down. Then the next day they came to survey their line, and I went to see what they were doing. I told them they had no business there, and that they had torn my fence down. They replied that they had orders to do it, and said to me, 'If you make any claim you go to court and file suit; there is no use making any argument; you cannot do anything to us, because we have orders to do what we have done.' I went a few days afterwards and told my attorney, Mr. Thurmond, about it. The fence that the Santa Fé employés tore down was mine. It was built after the houses had been torn down by order of the city. I put the fence there because I claimed the ground where I put it. I thought the houses there were mine. When Berrien and wife sold it to me they told me, 'We will give you a quitclaim deed for two lots or more, because we have had possession there for a long time.' They (Berrien and wife) told me they would give me a warranty deed, but would give me a quitclaim deed to this ground. I was in possession, either by fence inclosure or tenant, all the time from the time I bought from the Berriens until the employés of the Santa Fé tore down the fence. I knew the property for two or three years before I bought it and people were living on it then. I leased it to Jose Laguna."

Cross-examination: "I was not attempting by the claim I was asserting to take any part of the Santa Fé reservation grounds and do not want any Santa Fé reservation. It was not my purpose when I leased to Jose Laguna to claim any property belonging to the railroad company. I was not then, and am not now, claiming any land belonging to the railroad company. When I made the lease to Laguna I was not intending to lease any part of the land claimed or owned by the railroad company. I never lease somebody else's land.

"There was no intention on my part to have any house built by Laguna or anybody else on the railroad's property. I do not know that there was any mistake either by me or Laguna as to where the boundary line was when Laguna put his house on the railroad property. I understood, when I bought it, I bought two lots, more or less, nobody claiming it. I understood that if one got possession for some time it was his. I thought when I bought it it was mine, but there was no intention on my part when I made the lease to Laguna to take or claim any railroad company's land. I did not know at the time Laguna went in on this land that he got on the railroad company's property; I do not know that now."

Redirect examination: "I claimed the property where the shacks were that I rented to Jose Laguna as my property. The piece that the railroad took the possession of from me I claimed as my property. If I had not claimed it I would not have put a fence around it. That is the property I leased to Laguna.

"I thought the property belonged to me. After the houses were torn down the Santa Fé Railroad Company, or its employés, told me it was theirs. I told them, 'No; it was mine;' that raised the question, I did not know it before.

"I told them I claimed it; that was in 1910. They tore the fence down which I had put up, some three or four days after I put it up."

Appellant presents three assignments, all of which relate to the sufficiency of the evidence to support the judgment rendered, the propositions submitted in support of the assignments being as follows:

"It is the universal rule that the possession of the party claiming under the statute of limitation must be hostile against the world, including the true owner of the property."

"Adverse possession is to be taken strictly, and every presumption is in favor of a possession in subordination of the rightful owner."

"In order that possession under the statute of limitation may vest title to property in the possessor, it must be hostile to the true owner, must be continuous and uninterrupted under a claim of right to such property."

As we understand the question presented by the assignments and propositions, the contention is that the evidence discloses the possession was not hostile to the claim of appellant, and therefore not adverse as required by the 10-years statute of limitation; further, that, if it was, the same was not continuous for a period of 10 years.

The land conveyed by Watts to Gugerty was in the shape of a triangle with a base line of 70 feet. The description in the quitclaim deed from the Berriens to Abraham is not altogether clear, but it seems that this deed, and the warranty deed by the Berriens to Abraham, conveyed all of the triangular tract covered by the Watts deed. At any rate, upon the trial it seems to have been so regarded, and that the tract now in controversy was the premises conveyed by the quitclaim deed.

[1] As to the continuity of possession, it seems very clear that Mr. Berrien in 1887 took possession of the triangular tract purchased from Watts, and remained continuously in possession by tenants until he conveyed to Abraham in 1906, and that Abraham immediately succeeded him in like possession until dispossessed in 1910. This is quite apparent from the quoted testimony.

[2, 3] As to the other question presented, we think the evidence sufficient to support the finding of the trial court that the possession of both Berrien and Abraham was hostile to the claim of appellant and all others, and therefore adverse.

At the time of Berrien's purchase the property was staked off and a survey made. It is true the testimony of both Berrien and Abraham is that they were not attempting, during the period of their possession, to acquire any land which they thought belonged

to appellant, but at all times they were claiming this particular property as their own and repudiating title in appellant. Berrien testified: "My reason for putting tenants on the property was that I felt it was mine." Again: "I intended to claim it as mine. I did not know but what the Santa Fé would take another move." Abraham testified that he was not trying to take the railroad's land, and was not intending to lease to Laguna the railroad's land, but at the same time he testified that he thought this land was his; that he did not know when he leased it to Laguna it was the railroad's property and does not know that now. He further testified that when the company's employés tore down his fence in 1910 he protested and insisted that the land was his.

We think the evidence sufficient to support a finding that Berrien and Abraham were claiming for themselves in hostility to appellant and all others. This is sufficient. Smith v. Jones, 103 Tex. 632, 132 S. W. 469, 31 L. R. A. (N. S.) 153; Charle v. Saffold, 13 Tex. 112; Craig v. Cartwright, 65 Tex. 413. In questions of this kind each case in large measure depends upon its own facts, but, in support of the view that the evidence discloses possession adverse in its character, see Daughtrey v. N. Y. T. & Land Co., 61 S. W. 947; Jayne v. Hanna, 51 S. W. 296; Mann v. Schueling, 68 S. W. 292; Bisso v. Casper, 14 Tex. Civ. App. 19, 36 S. W. 345; Hand v. Swann, 1 Tex. Civ. App. 241, 21 S. W. 282.

Affirmed.

---

⬤➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes